**Ecker v. Ecker**

C.P. of Allegheny County, no. FD93-05184.

*Bernadette M. Staroschuck,* for defendant Ecker.
*James G. Connolly,* for plaintiff Ecker.

BAER, *A.J.,* January 23, 1997—Appellant/defendant Evelyn E. Ecker, First Wife, appeals from our order holding that she is (1) estopped from denying the validity of the divorce decree ending her marriage to Donald B. Ecker; (2) estopped from denying the validity of the marriage between Ecker and appellee/plaintiff Mildred D. Ecker, Second Wife; and (3) that Second Wife is the legal widow of Ecker.

This dispute concerns determining who is the legal widow of Ecker. The issue is important because both parties have claimed Ecker's substantial federal annuity benefits. Second Wife contends she is entitled to these benefits as Ecker's widow. First Wife argues that Ecker's marriage to Second Wife was void, and that therefore Ecker died unmarried. Under these facts and applicable regulations, she believes she is entitled to the annuity

fund as Ecker's former spouse. The federal Office of Personnel Management was unable to decide this matter, and deferred the issue of who is the legal widow of Ecker to the Pennsylvania courts for adjudication. Before addressing this issue, it is necessary to review the complicated factual and procedural history of this case.

In 1970, Ecker and First Wife separated. Thereafter, in 1972 and 1975 respectively, Ecker filed two different divorce actions against First Wife in the Court of Common Pleas of Allegheny County.[1] Neither of these actions resulted in the entry of a divorce decree. On June 3, 1975, Ecker obtained a divorce decree in the Dominican Republic without any prior notice to First Wife. He then obtained a marriage license in Washington County, Pennsylvania, and on June 25, 1975, entered into marriage with Second Wife.

In March 1976, First Wife brought an action against Ecker and Second Wife in Allegheny County challenging both the validity of the Dominican Republic divorce decree and Husband's subsequent marriage to Second Wife.[2] Prior to trial in this action, Ecker and First Wife executed a settlement agreement on July 1, 1976, which appeared to resolve their differences forever. In the agreement, in exchange for a cash payment of $8,000, First Wife agreed to accept the Dominican Republic divorce decree as fully valid and binding, and to recognize Ecker's second marriage.

Two years after the agreement was executed, First Wife married Raymond G. Gouker. That marriage lasted for six years until their divorce in 1985. Meanwhile, in 1983, Ecker died while First Wife was still married

1. No. 484, January Term, 1972; no. 611, April Term, 1975.
2. No. M 67 of 1976.

to Gouker. Subsequent to Ecker's death, pursuant to the beneficiary designation on Ecker's federal retirement annuity, Second Wife began receiving benefits from OPM.

Approximately four years after Ecker's death and two years after First Wife's divorce from Gouker, First Wife read an article in a publication by the American Association of Retired People, which led her to believe that she might be entitled to Ecker's federal annuity benefits. Thereafter, First Wife filed a claim with OPM. After a full administrative proceeding, OPM suspended payment of federal benefits to Second Wife, and began making payments to First Wife. On June 15, 1990, Second Wife sought reconsideration of OPM's decision. OPM then requested the parties to petition the Pennsylvania courts to determine the legal widow of Ecker.

To accomplish this, Second Wife filed a complaint. First Wife responded with preliminary objections. Eventually, Second Wife filed an amended complaint and a second amended complaint, both of which were responded to with preliminary objections. Finally, Second Wife's second amended complaint and First Wife's preliminary objections thereto were joined before us. Count I of the complaint sought a declaration that First Wife was estopped from challenging the validity of the Dominican Republic divorce decree, and that, therefore, Second Wife was the lawful widow of Ecker. The complaint also included counts for breach of contract, intentional infliction of emotional distress and fraud. We denied preliminary objections as to Count I, and directed that First Wife file an answer thereto. We stayed further proceedings on Counts II through IV until final disposition of Count I.

Eventually, the parties filed cross-motions for summary judgment. We denied both motions, and scheduled

the case for an evidentiary hearing. That hearing was to consider (1) whether First Wife was estopped from denying both the validity of the Dominican Republic divorce decree and Second Wife's marriage to Ecker; and, in the alternative, to determine (2) whether Second Wife and Ecker reaffirmed their marriage after First Wife and Ecker entered into their 1976 agreement.

After hearing and full consideration of the evidence, we found First Wife was estopped from denying the validity of the June 3, 1975 Dominican Republic divorce decree and subsequent marriage between Ecker and Second Wife, and therefore, Second Wife was the legal widow of Ecker. We were aware that First Wife desired to appeal this decision. Accordingly, our order respectfully requested that the Superior Court accept certification of the appeal notwithstanding that Counts II through IV of First Wife's complaint remained pending. We made this request because we believed, as a pragmatic matter, that final adjudication of Count I would resolve the dispute between the parties.

First Wife filed a petition for permission to appeal an interlocutory order and a protective notice of appeal. Notwithstanding our acquiescence in certification of the issue, the Superior Court denied the petition for allowance of appeal and quashed the notice of appeal as interlocutory. First Wife filed a petition for allowance of appeal to the Supreme Court which was denied in a per curiam order. Subsequent to the Supreme Court's order, we scheduled a conciliation to address Counts II through IV of Second Wife's complaint. During the interim period, Second Wife filed a praecipe to settle and discontinue the action as to Counts II through IV.[3]

---

3. This praecipe was filed inadvertently, at a civil division number instead of the family division number. We eventually entered an

First Wife then filed a motion to strike Second Wife's praecipe to settle and discontinue, which we denied. Instead, we ordered that the praecipe "remain in full force and effect." Thus, all of Second Wife's claims contained in Counts II through IV of her complaint were dismissed, and the only claims remaining sub judice were those which we fully adjudicated in our order deciding Count I. The result of this procedural maneuvering was that that order became what we believe to be a final order, and thus the proper subject for an appeal. First Wife filed a motion for reconsideration before us and a notice of appeal to the Superior Court. We denied the motion for reconsideration. Thus, the notice of appeal in this matter has been taken from a final order.

First Wife's Pa.R.A.P. 1925(b) statement of matters complained of on appeal lists 17 errors of law committed by this court. Those errors can be stated succinctly in the following two issues:

"(1) Whether the court erred in finding that First Wife was estopped from denying both the validity of the Dominican Republic divorce decree and the subsequent marriage between Ecker and Second Wife; and,

"(2) Whether the court erred in finding Second Wife was the legal widow of Ecker."

Initially, we address First Wife's assertion that the issue in this case is not whether she is estopped from denying the validity of the Dominican Republic divorce decree and the subsequent marriage between Ecker and Second Wife, but, instead, who is the legal widow of

---

order consolidating the civil and family cases. This insured that Second Wife's praecipe to settle and discontinue Counts II through IV of her complaint was docketed in the case before us, and therefore had the effect of dismissing those counts.

Ecker under Pennsylvania law. First Wife argues that the latter issue was the one before OPM, and OPM deferred to the Pennsylvania courts for a determination on that issue alone. Thus, First Wife claims that we should not consider the issue of estoppel, but rather turn directly to the question of whether Ecker's Dominican Republic divorce decree was valid and, accordingly, whether Ecker's and Second Wife's marriage was invalid.

We disagree. We are guided in our decision by our Superior Court's analysis in *Lowenschuss v. Lowenschuss,* 396 Pa. Super. 531, 579 A.2d 377 (1990), *alloc. denied,* 527 Pa. 611, 590 A.2d 297 (1991). In *Lowenschuss,* the trial court accepted the argument that First Wife makes herein. The Superior Court reversed finding the trial court's analysis to be "misguided." *Id.* at 540, 579 A.2d at 381. The court opined that the "proper approach" was to first consider estoppel. If the moving party was estopped from raising the issue of the validity of a prior divorce and present marriage, the inquiry would be at an end. *Id.* While we recognize factual distinctions between the case at bar and *Lowenschuss,* they do not detract from the applicability of the estoppel principle set forth therein to this case. Thus, we believe it is not only appropriate but mandatory that we first consider whether First Wife is estopped from denying her divorce from Ecker and Second Wife's and Ecker's subsequent marriage.

In *Lowenschuss,* the court noted that Pennsylvania law has long recognized a general equitable estoppel doctrine which is specifically applicable to matrimonial actions. This equitable estoppel doctrine is distinct from "classic estoppel," and was originally set forth in section 74 of the Restatement (Second) Conflict of Laws and Comment (b) thereto which was quoted *verbatim* by

the *Lowenschuss* court, and which provides as follows: "[a] person may be precluded from attacking the validity of a foreign divorce decree if, under the circumstances, it would be inequitable for him to do so . . . this type of estoppel is . . . not limited to situations of 'true estoppel' where one party induces another to rely to his damage upon certain representations. The rule may be applied whenever, under all of the circumstances, it would be inequitable to permit a particular person to challenge the validity of a divorce decree. Such inequity may exist when action has been taken in reliance on the divorce or [where] expectations are based on it or when the attack on the divorce is inconsistent with the earlier conduct of the attacking party." *Id.* at 540-41, 579 A.2d at 381.

The *Lowenschuss* court noted that this form of estoppel is broader in its focus than classic equitable estoppel, and requires "consideration of all of the circumstances surrounding not only the procurement of the divorce, but also the conduct of the parties thereafter and the effect of a declaration of the invalidity of the divorce on others." *Id.* at 541, 579 A.2d at 381, citing to H. Clark, Law of Domestic Relations, §13.3 at 734-37 (1987). *Lowenschuss* suggested that the following factors be considered by a court deciding whether or not to invoke estoppel: (1) the acceptance of benefits, such as alimony pursuant to a divorce; (2) remarriage after the defective decree, either by the person attacking it, or by the other party; and, (3) reliance by innocent third parties the upon the invalid decree. Additionally, *Lowenschuss* pointed out that a long acquiescence in one's divorce with knowledge of any potential jurisdictional defect will often foreclose an attack. *Id.*

Our record sets forth that in March 1976, First Wife and Ecker entered into a settlement agreement resolving

First Wife's action before our court challenging the validity of the Dominican Republic divorce decree. Paragraphs 1 and 9 of the agreement are unambiguous and state:

"(1) Husband and wife shall consider each other to be legally and validly divorced by virtue of the Dominican Republic divorce decree entered on June 3, 1975 and filed in the Marriage License Bureau of Washington County, Pennsylvania. . . .

"(9) . . . [B]oth parties have agreed that they are legally and validly divorced by virtue of the Dominican Republic divorce decree entered on June 3, 1975. . . ."

The agreement provided for First Wife to receive $8,000 to settle and discontinue her action challenging the validity of the Dominican Republic divorce decree.[4]

First Wife testified that she believed that she was divorced from Ecker at the time the agreement was executed. Two years later, obviously in reliance on her divorce from Ecker, First Wife married Ray Gouker. She assumed Gouker's last name and considered him to be her husband for approximately the next six years, until their divorce in 1985. When First Wife wrote to OPM inquiring about her entitlement to Ecker's benefits, she referred to Ecker as her "ex-husband," and referenced her date of divorce from Ecker as May 16, 1975.

Under these facts, it would be wholly inequitable to permit First Wife to attack the divorce decree between her and Ecker or Ecker's second marriage. First Wife signed the settlement agreement expressly acknowledging the validity and legality of the divorce, and agreed to be bound by it knowing full well that Ecker had remarried as a result of it. Indeed, Second Wife

---

4. First Wife acknowledged receipt of this money.

was a party to First Wife's action to overturn the divorce decree. Moreover, First Wife accepted $8,000 as consideration for the settlement, and remarried after entry of the decree.

In revisiting the factors set forth in *Lowenschuss* and on pages 6 and 7 of this opinion, we see that First Wife accepted benefits pursuant to the divorce, remarried after entry of the decree, and caused both Ecker and Second Wife, who is, as discussed below, an innocent third party, to rely upon the decree. We note also that First Wife waited 10 years, and, indeed, until after Ecker died, before challenging the divorce and subsequent remarriage through her claim to Ecker's federal benefits. When First Wife finally attacked the divorce decree, it was solely to gain substantial economic benefit by claiming his federal pension. As the court said in *Lowenschuss* "[Wife] cannot now contradict [her] course of [prior] conduct . . . [she] cannot be given the right to decide when the parties are to be considered married and when they are not, depending on what suits [her] personal or economical interest." *Lowenschuss, supra* at 549, 579 A.2d at 386.

Even if estoppel principles were not dispositive of this case, we would nevertheless decide that Second Wife was Ecker's lawful widow. The basis for First Wife's argument is that the Dominican Republic divorce decree was invalid, and consequently, at the moment Ecker married Second Wife, he remained married to First Wife, and therefore the second marriage was void. The difficulty with this argument is that even assuming its accuracy, it ignores that if the impediment is subsequently removed and Ecker and Second Wife continue to live together, then Pennsylvania law recognizes the marriage. See 23 Pa.C.S. §1702. Section 1702 provides that if a married person enters into a subsequent mar-

riage, the parties to that marriage live together as husband and wife, and the subsequent marriage was entered into by one or both of the parties in a good faith belief that the former marriage was terminated by divorce, then they shall be held to be married from the date of the divorce, if one of them in good faith continues to live as husband/wife after the impediment has been removed.

In this case, Second Wife testified before us that she was aware that Ecker went to the Dominican Republic and obtained a divorce on June 3, 1975. She stated that she did not consider it odd or inappropriate for Ecker to go to the Dominican Republic to obtain a divorce because she believed that Ecker could not locate First Wife. After Ecker obtained the Dominican Republic divorce, she and Ecker went to the Washington County Courthouse and presented their respective divorce decrees. They obtained a marriage license, and were married by a minister of the Trinity Church. Until they were married, they lived in separate residences.

We found Second Wife's testimony in regard to these facts to be credible.[5] She answered all questions put to her with sincerity and without hesitation. Moreover, her explanation appears to be consistent with common sense. Ecker obtained a divorce decree, it was disclosed to and reviewed by Washington County authorities, the marriage license was issued and the minister performed the marriage. A person uneducated in the law, without legal counsel or expertise, could very reasonably conclude that the divorce decree issued by one legal authority and accepted by another was indeed valid.

---

5. Indeed, we found the testimony of both First and Second Wife credible. We simply find First Wife's position under the facts as she testified to them to be nonmeritorious.

We therefore find that Second Wife was in good faith at the time she entered into the marriage with Ecker. She continued to live with him as husband and wife. When First Wife executed the agreement in this county explicitly recognizing the divorce and agreeing to be bound by it, any impediment caused by the invalidity of the divorce was removed. With its removal, pursuant to 23 Pa.C.S. §1702, Pennsylvania recognized the marriage. See also, *Dowd v. Dowd,* 275 Pa. Super. 472, 418 A.2d 1387 (1980).

On either an estoppel theory or upon a review of the substantive law theory, Second Wife should be recognized as Ecker's lawful widow.